**In re BOWEN ENTERPRISES, INC., d/b/a Indiana Shop 'N Save, Debtor.**

**BOWEN ENTERPRISES, INC., d/b/a Indiana Shop 'N Save, Movant,**

**v.**

**UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 23, AFL–CIO–CLC, Respondent.**

Bankruptcy No. 96–21141–BM.

Motion No. 96–1118M.

United States Bankruptcy Court, W.D. Pennsylvania.

June 6, 1996.

Roger G. Rulong, Jr., Vollmer, Rulong & Associates, P.C., Pittsburgh, PA, for Debtor.

Anthony P. Leech, Leech & Tishman, Pittsburgh, PA, for Union.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Chief Judge.

We are confronted with a paradigmatic lose-lose situation. Debtor seeks permission to reject its collective bargaining agreement with United Food and Commercial Workers International, No. 23 (hereinafter "union"): Denial of its request indubitably will result in debtor's liquidation in the very near future. The union is adamantly opposed to debtor's request and has stated that it will strike if debtor rejects the collective bargaining agreement. Should this happen, the outcome almost certainly will be the same as if debtor's request is denied.

Lacking the wisdom of King Solomon, we are not able to dissuade the parties from marching hand-in-hand to their apparent mutual destruction. All that we can do is apply the law to the facts of this case and hope that reason prevails in the end and both sides survive (and even eventually flourish).

An order was issued on May 24, 1996, granting debtor's motion to reject the collective bargaining agreement. This memorandum opinion explains the basis for that order.

–I–

### FACTS

Debtor operates a "full service" retail supermarket in Indiana, Pennsylvania, which contains several departments—e.g., a butcher shop, a deli, a bakery, and a floral shop— that fill special orders by customers. It also provides clerks who carry a customer's groceries to their car. Two individuals own all of its stock and function as its officers. Their salaries in 1995 were $50,000.00 and $27,500.00, respectively.

In February of 1993, debtor entered into a collective bargaining agreement with the union as the collective bargaining agent for debtor's unionized employees. The agreement remained in force until February 17, 1996, and thereafter was automatically renewed for another year when neither side notified the other in writing sixty days prior to the agreement's expiration of its intention to terminate the contract.

On July 1, 1995, WalMart opened a store containing approximately sixty thousand square feet of retail grocery space in direct competition with debtor.

Super Value was debtor's previous grocery supplier and had subleased to debtor the building containing some thirty-nine thousand square feet in which debtor conducted its operations. In September of 1995, Super Value notified debtor that it intended to open a new supermarket nearby and that it would not renew its sublease with debtor as of April 1, 1996.

At or about this time, debtor had preliminary discussions with the union about modifying the collective bargaining agreement. In addition to wage concessions, debtor sought changes concerning Sunday pay rates, holiday pay, and the amount of allowed paid vacation. During the discussions, the union tentatively agreed to the proposed modifications but, for unclear reasons, never formally accepted them.

Prior to the opening of WalMart, debtor's gross weekly sales averaged approximately $350,000.00. Shortly after WalMart opened, debtor's gross weekly sales declined to $220,000.00. Its gross income in 1994 was $18,476,077.00 and was $15,760,951.00 in 1995. Debtor's gross weekly sales must be between $210,000.00 and $215,000.00 for debtor to break even. Debtor suffered its first operating loss in December of 1995.

On February 15, 1996, Super Value stopped supplying debtor, which ceased operating two days later and filed a voluntary chapter 11 petition on March 6, 1996. The schedules accompanying the petition list assets with a declared value of $1,382,529.14 and total liabilities in the amount of $267,959.43.

On March 6, 1996, debtor also submitted a motion pursuant to 11 U.S.C. § 1113(e) requesting authority to implement interim changes to the above collective bargaining agreement. Debtor sought to reduce the wages paid to employees belonging to the bargaining unit in accordance with a schedule; to redefine "overtime"; to eliminate New Year's Day as a holiday; to eliminate "personal days"; and to reduce the amount

of allowable paid vacation. The union vigorously opposed the motion.

An order was issued after an emergency hearing on March 11, 1996, granting the motion, provided that: debtor's shareholders received no pay or dividends during that period; wages and benefits of managerial employees, who did not belong to the bargaining unit, were reduced by the same amount as for the members of the bargaining unit; debtor made a good-faith attempt to obtain comparable concessions from its pre-petition creditors; and debtor forthwith began negotiating with the union to arrive at a modified labor agreement. The order was valid for sixty days and expired on May 11, 1996.

On March 15, 1996, debtor sent a letter to the union and its counsel wherein debtor proposed some thirty-nine amendments of the above collective bargaining agreement. In addition to seeking wage reductions, debtor also sought a reduction in the number of weeks of paid vacation; to delete New Year's Day as a holiday for which employees were paid time-and-a-half and instead to pay them a premium of $.50 to $1.00 per hour; to eliminate "personal days"; to reduce the differential for working the night shift; to exclude Sunday from the regular work week; to reduce debtor's contribution to the pension plan; and to eliminate debtor's contribution to the union's legal fund and scholarship fund. The proposed wage concessions and other modifications were virtually identical to the proposals the union had preliminarily accepted in October of the previous year. The term of the modified agreement as proposed by debtor was five years.

In addition to making the above proposals, debtor indicated that it was in the process of preparing a cost analysis of the proposed changes and that it would provide the union with the information as soon as it was available.

On March 21, 1996, in response to a request from the union, debtor also made available to the union: debtor's financial statements for 1992 through 1995; debtor's federal income tax returns for 1993, 1994 and 1995; a list of debtor's employees who did not belong to the bargaining unit; a se-niority list for bargaining-unit employees; wage and benefit records for bargaining-unit employees for 1995; and the hours per month worked by all employees in 1995. Debtor also requested a meeting with the union at the earliest convenient time to discuss the above proposals.

On March 22, 1996, debtor provided the union with the cost analysis referred to above in which debtor projected the savings resulting from its proposed modifications to the collective bargaining agreement.

Debtor and the union met several times over the following weeks to discuss the proposals.

The first bargaining session was held on March 26, 1996, at which time debtor formally presented the above proposed modifications. Certain minor modifications were withdrawn by the debtor during the session.

The second bargaining session was held on March 28, 1996. Debtor's accountant attended the session at the union's request to answer questions it had about the savings projected by debtor from its proposed modifications.

At the third bargaining session, held on April 1, 1996, the union took issue with debtor's cost analysis and orally responded on a point-by-point basis to debtor's proposals. Virtually all of debtor's proposals were rejected. The union did not at that time state its position on the proposed wage reductions.

The fourth bargaining session was held on April 9, 1996. The union submitted its own counterproposal calling for initial wage concessions ranging from ten percent to one percent and for annual incremental wage increases with full recovery of concessions by the third and final year of the contract. Also, the union submitted a cost analysis for its counterproposal which was based on "productivity levels". Debtor also withdrew certain of its proposals that were non-economic in nature.

The fifth bargaining session was held on April 15, 1996, at which time the union presented a revised projection of savings to debtor under its counterproposal. Debtor responded to the union's initial cost analysis

and also withdrew some more of its proposed modifications that were non-economic in nature.

On April 17, 1996, debtor submitted a motion for leave to incur post-petition financing. Among other things, debtor sought leave to enter into an agreement with Penn Traffic Company whereby: Penn Traffic would provide debtor with grocery supplies; debtor would enter into a sublease with Penn Traffic; Penn Traffic would be granted a first priority lien against debtor's assets; S & T Bank would issue an irrevocable letter of credit in the amount of $175,000.00 payable to Super Value; and S & T would subordinate its lien to that of Penn Traffic. The irrevocable letter of credit was guaranteed by one of debtor's principals, who pledged his shares of stock in another corporation as collateral.

Debtor's motion was granted over the objection of the union after an emergency hearing was conducted on April 20, 1996.

Debtor reopened for business on April 21, 1996, after executing the above supply agreement and sublease with Penn Traffic. The term of the lease was five years, with three five-year renewal options.

It is customary in the retail supermarket industry for a supplier to add an "upcharge" to the amount due under the sublease which exceeds by ten percent the amount the supplier owes under the lease it enters into with the lessor. Penn Traffic agreed to certain concessions on the sublease to help debtor get back on its feet. It agreed to reduce its "upcharge" to five percent and to pay fifty percent of debtor's remodeling costs. Also, the monthly rental under the sublease was reduced to the same rate debtor had paid for the same site in 1978, some eighteen years earlier. Penn Traffic also agreed to forego for ten weeks payment of interest due on the sum of $250,000.00 it advanced to debtor for products it initially provided when debtor reopened for business.

On or about May 10, 1996, debtor sent a letter to all former employees detailing the terms and conditions of their employment in the event it rejected the collective bargaining agreement. Debtor now has one hundred and one employees who belong to the bargaining unit and ten managers who do not belong to the bargaining unit. Some of them now make less than do the highest-paid bargaining-unit employees due to the reduction of their wages resulting from the order of March 11, 1996. Since its reopening, debtor employs forty-two more employees than it did when it ceased operating in February of 1996. Of the seventy-nine bargaining unit members previously employed by debtor, fifty-four returned to work.

Debtor's gross sales revenues for the first three weeks after it reopened were $180,000.00, $151,000.00, and $179,000.00, respectively. These revenues are some thirty percent lower than sales revenues realized when debtor ceased operating in February of 1996. Since it reopened, debtor is losing approximately three thousand dollars per week. Its grand reopening sales promotion has not yet occurred but is expected to take place in the near future.

Since entry of the order of March 11, 1996, debtor has contacted all of its pre-petition creditors and sought from them concessions of the magnitude it sought from the union. Twenty-two of the sixty-seven creditors contacted have agreed to reduce the amount of their pre-petition claims by twenty percent.

On May 1, 1996, debtor submitted a motion pursuant to 11 U.S.C. § 1113 to reject its collective bargaining agreement with the union. The union strenuously objects. It asserts that the modifications proposed by debtor are not necessary to permit debtor to reorganize and do not treat bargaining unit employees fairly and equitably. According to the union, debtor did not bargain in good faith. It also claims that it refused to accept debtor's proposal for good cause and that the balance of the equities do not favor rejection of the collective bargaining agreement.

The sixth and final negotiating session between debtor and the union was held on May 3, 1996. No agreement was reached by the parties. During the session, the union's chief negotiator threatened to drive debtor out of business and to "cut a deal" directly with Penn Traffic.

A strike vote by members of the bargaining unit was held on May 13, 1996. Only thirty-six of the members eligible to vote attended the meeting. Twenty-eight voted in favor of a strike if debtor rejects the collective bargaining agreement.

An evidentiary hearing on debtor's motion to reject was held on May 15th and May 16th of 1996. Both sides were given an opportunity to offer evidence on the issues before the court. Briefs were due and in fact submitted on May 20, 1996.

## –II–

### DISCUSSION

Debtor may reject a collective bargaining agreement provided that the following requirements mandated by 11 U.S.C. § 1113 are met:

(1) debtor must make a proposal to the union to modify the collective bargaining agreement (11 U.S.C. § 1113(b)(1)(A));

(2) the proposal must be based on the most complete and reliable information available at the time of the proposal (11 U.S.C. § 1113(b)(1)(A));

(3) the proposed modifications must be necessary to permit debtor to reorganize (11 U.S.C. § 1113(b)(1)(A));

(4) the proposed modifications must assure that all creditors, debtor, and all interested parties are treated fairly and equitably (11 U.S.C. § 1113(b)(1)(A));

(5) debtor must provide union with such information as is required to evaluate the proposal (11 U.S.C. § 1113(b)(1)(B));

(6) between the time of making the proposal and the hearing on the motion to reject the collective bargaining agreement, debtor must meet at reasonable times with the union (11 U.S.C. § 1113(b)(2));

(7) debtor must confer in good faith in attempting to reach mutually acceptable modifications of the collective bargaining agreement (11 U.S.C. § 1113(c)(2));

(8) the union must have rejected the proposal without good cause (11 U.S.C. § 113(c)(2)); and

(9) the balance of the equities must clearly favor rejection of the collective bargaining agreement (11 U.S.C. § 1113(c)(2)).

*See In re George Cindrich General Contracting, Inc.,* 130 B.R. 20, 23 (Bankr.W.D.Pa. 1991); *Matter of Sol–Sieff Produce Co.,* 82 B.R. 787, 791–92 (Bankr.W.D.Pa.1988).

 Debtor bears the ultimate burden of persuasion, by a preponderance of the evidence, as to all of these requirements. This does not, however, mean that the burden of production is upon debtor in every instance. The burden of production lies upon the union as to requirements (5), (7), and (8). *See In re Express Freight Lines, Inc.,* 119 B.R. 1006 (Bankr.E.D.Wis.1990); *In re Garofalo's Finer Foods,* 117 B.R. 363, 370 (Bankr.N.D.Ill.1990).

There is no dispute that requirements (1), (2), (5), and (6) are satisfied in this case. Debtor sent a letter to the union on March 15, 1996, proposing thirty-nine modifications to the collective bargaining agreement. The parties held six lengthy bargaining sessions at which they discussed the proposed modifications. Debtor promptly provided the union with a cost analysis of its proposed modifications and financial statements, tax returns, and other information the union had requested. In so doing, debtor provided the union with such information as it needed to evaluate debtor's proposal.

The dispute involves the remaining requirements—i.e., requirements (3), (4), (7), (8), and (9). We shall address them *seriatim.*

### (A) Are The Proposed Modifications Necessary?

Section 1113(b)(1)(A) of the Bankruptcy Code provides in part that a debtor's proposal shall contain "those modifications that are necessary to permit the reorganization of the debtor".

 Only those modifications which are directly related to debtor's financial condition and are essential to its reorganization are "necessary" for purposes of § 1113(b)(1). *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America,* 791 F.2d 1074, 1081 (3d Cir.1986). The focus when making this determination is upon the short-term goal of

avoiding liquidation, not upon the long-term goal of making debtor "whole" once it emerges from reorganization. *Id.* at 1089. In short, a proposed modification is "necessary" in this context only if it is the minimum that is essential to prevent debtor's liquidation. Any proposed modifications that go beyond this are not "necessary" for purposes of § 1113(b)(1)(A).

Debtor ceased operating in February of 1996 largely because of high labor costs and decreased sales due to intense competition. In addition, debtor's sales revenues since it reopened are considerably below what they were when debtor closed in February of 1996. Unless debtor obtains some relief from the union in the form of economic concessions, it almost assuredly will have to close its doors in the very near future and undergo liquidation.

■ The union apparently does not take issue with this last proposition but instead asserts that debtor's proposed modifications go far beyond what it needs to prevent its liquidation. As was noted previously, debtor's proposed modifications called for a five-year agreement which reduced and froze wages and benefits throughout the term of the agreement without offering a "snapback" provision for restoring wages and benefits should debtor do better than anticipated. Such a proposal, the union insists, goes beyond what is required for debtor to reorganize.

This last proposition is inaccurate. If anything, the concessions debtor requested from the union may not even be sufficient to prevent debtor's liquidation in the near term. At present debtor's weekly revenues are more than thirty thousand dollars below what it needs to break even in its operations. One might wonder whether the savings debtor would realize from its proposed modifications will completely offset the shortfall in sales revenues. The accusation that debtor has overreached in seeking the above modifications is without merit. If our assessment is correct, the concessions debtor sought may not be sweeping enough.

The union apparently maintains that debtor's proposal is not necessary because it reduces and freezes wages for five years and

contains no "snap-back" provision. We are aware of no binding precedent which holds that, as a matter of law, such a proposed modification is not "necessary". Moreover, it is more likely than not that debtor will have to liquidate later, if not sooner, without such proposed modifications. Debtor's need for a wage reduction and freeze will be as great several years from now as it is at present.

In our estimation, the union's heavy reliance upon the absence of a "snap-back" provision in the event debtor did better in the future than was anticipated is disingenuous. Had the union believed that such a provision was important, we would expect the union to have proposed it during negotiations. Although the union did propose annual wage increases in its counterproposal, it did not propose a "snap-back" provision.

Some thirty of the thirty-nine modifications debtor initially proposed arguably would not confer a direct economic benefit upon debtor if they were implemented. One of debtor's principals testified that such proposals were included to "clean up" some of the language in the existing agreement.

■ The United States Court of Appeals for the Third Circuit has stated that the term "necessary" must be strictly construed to signify "only those modifications that are directly related to the Company's financial condition and its reorganization". *Wheeling–Pittsburgh Steel,* 791 F.2d at 1088.

■ The union further maintains that debtor may not reject the collective bargaining agreement because the vast majority of the proposed modifications were not essential in that they would not confer a direct economic benefit upon debtor even if the union agreed to them. Accordingly, it argues, they were not "necessary" for purposes of § 1113(b)(1).

It is not entirely obvious from the above statement in *Wheeling–Pittsburgh Steel* whether inclusion of proposed modifications that are non-economic in nature along with proposed modifications that are economic in nature is fatal to rejection of a collective bargaining agreement. Some courts have held that inclusion of such modifications nec-

essarily is fatal. *See In re Sun Glo Coal Co., Inc.,* 144 B.R. 58, 63 (Bankr.E.D.Ky.1992); *In re William P. Brogna Co., Inc.,* 64 B.R. 390, 392 (Bankr.E.D.Pa.1986). Others have held that it is not. *In re Hoffman Brothers Packing Co.,* 173 B.R. 177, 182–83 (9th Cir. BAP 1994).

Fortunately we need not determine for ourselves whether the above statement in *Wheeling–Pittsburgh Steel* means that debtor's application to reject the collective bargaining agreement must be denied. The union's insistence that it must be denied for this reason is without merit in this instance. Although debtor initially did include some thirty proposed modifications that arguably conferred no economic benefit upon it, every such proposed modification to which the union objected eventually was withdrawn. We see no good reason why compliance with § 1113(b)(1)(A) should preclude a debtor from initially proposing such modifications in an attempt to reach a comprehensive agreement that encompasses a variety of concerns. Compliance with § 1113(b)(1)(A) does not, in our estimation, preclude a debtor from making such proposals in the preliminary stages of negotiations to find out whether they may be acceptable to the union.

### (B) Are The Proposed Modifications Fair And Equitable?

Section 1113(b)(1)(A) of the Bankruptcy Code also provides in part that modifications proposed by the debtor must assure that "all creditors, the debtor and all of the affected parties are treated fairly and equitably".

■ A debtor may not seek to place a disproportionate share of the financial burden of avoiding liquidation upon bargaining unit employees. The burden must be spread fairly and equitably among all affected parties. *Wheeling–Pittsburgh Steel,* 791 F.2d at 1091. The focus of inquiry is upon whether the proposed sacrifices will be borne exclusively by members of the bargaining unit or will be spread among all affected parties. *Id.* The concessions sought from various parties must be examined from a realistic standpoint. *Id.* at 1093.

As was noted previously, only twenty-two of debtor's sixty-seven pre-petition creditors thus far have agreed to reduce their claims by twenty-percent. The total amount of their claims is only slightly in excess of five thousand dollars. Moreover, one of debtor's principals testified that he intended in the near future to raise the wages of some of the non-unionized managerial employees because they now are paid less than some of the highest paid bargaining unit employees. He further testified that he and debtor's other principal do not intend to forego all salary for the next five years. They instead intend for the time being to pay themselves eighty percent of their salaries and to be paid in full if and when debtor becomes profitable again during the next five years.

The union asserts that the proposed modifications are not fair and equitable because debtor seeks to reduce and freeze the wages and benefits of bargaining unit employees by some twenty percent for a period of five years without obtaining comparable concessions from pre-petition creditors, from employees who do not belong to the bargaining unit, and from debtor's principals.

■ This assertion is without merit. Fairness and equity do not require that the proposed treatment of employees belonging to the bargaining unit be identical to the anticipated treatment of other affected parties. *See In re Allied Delivery System, Co.,* 49 B.R. 700, 702 (Bankr.N.D.Ohio 1985).

In our estimation, debtor is not seeking in this instance to have members of the collective bargaining unit bear a disproportionate share of the sacrifices so that debtor may avoid liquidation. As we indicated previously, we are aware of no rule that a proposal to reduce and freeze wages for a period of five years is improper *per se.*

■ Furthermore, it would not be unfair and inequitable for debtor to raise the wages of some of its non-unionized managerial employees whose wages now are lower than the wages of some of the highest-paid employees belonging to the bargaining unit. We do not see it as unfair and inequitable that managerial employees be paid at least as much, if not more than, the employees whom they supervise and manage.

■ Similarly, we see nothing unfair and inequitable in debtor's principals receiving eighty percent of their salaries for now rather than receiving no salary at all. Although their intention to pay themselves their full salaries if and when debtor becomes profitable within the next five years and has paid off its creditors at first glance might seem unfair and inequitable, further reflection persuades us that it is not. As a result of the order of March 11, 1996, debtor's principals have received no salary or dividends. In this respect their sacrifice has exceeded that which was required of employees belonging to the bargaining unit. Moreover, even if they do fully restore their salaries and dividends if and when debtor becomes profitable again, the actual dollar amount involved pales to insignificance when compared to the dollar amount involved if debtor were to fully restore the wages and benefits of employees belonging to the bargaining unit.

■ The fact that forty-five of sixty-seven pre-petition creditors, who hold the vast preponderance of pre-petition debt owed by debtor, have not yet agreed to a twenty percent reduction in the amount of their pre-petition claims does not compel the conclusion that the proposed wage and benefit reduction and freeze for members of the bargaining unit is unfair and inequitable. Like the union, they are not required to agree to such concessions. This does not, however, mean that debtor lacks the ability to obtain a reduction in the amount of their claims which will be paid under a plan of reorganization. We most likely would look long and hard at any proposed plan of reorganization which does not require comparable sacrifices by debtor's pre-petition creditors.

Finally, we find it highly significant in this regard that debtor's present grocery supplier has made significant concessions to help debtor get back on its feet once again. As was noted previously, Penn Traffic voluntarily agreed to forego for a period of time payment of any interest on the initial $250,-000.00 in credit it extended to debtor when it made the first delivery of supplies. It also voluntarily reduced its "upcharge" from ten percent, which is customary in the industry, to five percent and is charging debtor the same rent as debtor paid for the same location some eighteen years earlier.

The above considerations lead us to conclude that, on balance, the members of the bargaining unit are not being singled out to shoulder a disproportionate share of the sacrifices needed if debtor is to avoid liquidation.

### (C) Has Debtor Bargained In Good Faith?

Section 1113(b)(2) requires the debtor to meet, at reasonable times, with the authorized representative of the employees covered by the collective bargaining agreement "to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement".

■ "Good faith" is defined as "conduct indicating an honest purpose to arrive at an agreement as the result of the bargaining process". *Matter of Walway Co.*, 69 B.R. 967, 973 (Bankr.E.D.Mich.1987). The requirement is satisfied if debtor seriously attempts to negotiate a reasonable modifications of an existing collective bargaining agreement prior to its motion to reject it. *In re Kentucky Truck Sales, Inc.*, 52 B.R. 797, 801 (Bankr.W.D.Ky.1985).

The union denies that debtor bargained in good faith. In support of its contention, the union points to the following alleged conduct by debtor during negotiations to modify the existing collective bargaining agreement. According to the union, debtor unilaterally modified the collective bargaining agreement in violation of Section 1113(e) by refusing to pay the required Sunday premium since it reopened on April 21, 1996; by failing to make timely contributions to the union's health and welfare plans for April and May of 1996; by distributing a letter to employees belonging to the bargaining unit offering them "conditional employment" on terms better than what debtor offered at the bargaining table; by wasting time in proposing numerous non-economic modifications and then withdrawing all of them by the final negotiating session; and by calling for more onerous concessions than are essential if debtor is to avoid liquidation.

The union's contention that debtor has not bargained in good faith is without merit.

■ We previously dealt with debtor's proposing various non-economic modifications and then withdrawing them when the union refused to budge and with the contention that debtor sought "more onerous" concessions than are essential if it is to avoid liquidation. Such conduct, we determined, did not prevent debtor from rejecting the existing collective bargaining agreement. Neither does it evidence bad faith on debtor's part.

■ As for its refusal to pay Sunday premiums since it reopened, debtor insists that its refusal to do so is warranted by the order of March 11, 1996. We need not determine at this time whether or not debtor is correct on this point. Even if it is not, its refusal to pay the premium is the result of a bona fide disagreement as to the scope and effect of the order of March 11, 1996.

The contention that debtor acted in bad faith by failing to make required contributions to the union's health and welfare funds for April and May of 1996 is groundless. Payment for a given month was not due until the union sent a "bill" to debtor on or about the first of that month. Debtor was not required to make payment until the twentieth of that month.

Debtor was not responsible for contributions prior to April 21, 1996, because it had closed in February and did not reopen until April 21, 1996. Debtor made the contributions due subsequent to April 21, 1996, and for May of 1996 on May 14, 1996. Considering the circumstances, we have to conclude that debtor made the required contributions for April and May of 1996 in a timely manner.

The union's accusation that dissemination to members of the bargaining unit of the letter dated May 10, 1996, sent to the union's chief negotiator is evidence of bad faith is meritless. Contrary to the union's assertion, debtor did not offer "conditional employment" to union members on the terms and conditions set forth in the letter. The letter instead was in response to a request by the union's chief negotiator for the terms and conditions under which members of the bargaining unit would be employed in the event debtor was allowed to reject the collective bargaining agreement. Debtor was not offering "conditional employment" to members of the bargaining unit when it sent it to them. Even if it were so doing, the letter was sent after negotiations had reached an impasse and it was obvious that no further negotiations were contemplated.

■ The matter does end there. Even if some (or all) of the alleged misconduct by debtor occurred, the overwhelming weight of the evidence compels the conclusion that debtor genuinely sought to reach agreement at the bargaining sessions and seriously attempted to negotiate reasonable modifications to the existing collective bargaining agreement.

As was indicated previously, debtor met at length with the union six times between March 26, 1996, and May 3, 1996, to discuss the proposed modifications. It also provided the union with a detailed cost analysis of its proposals and provided the union with all other information it requested to evaluate the proposals. At the request of the union, debtor's accountant attended one of the bargaining sessions to answer the union's questions about debtor's cost analysis. Debtor also responded to the union's counterproposal and, by the end of the final bargaining session, had withdrawn all objectionable non-economic proposals. In short, debtor at all relevant times was ready, willing, and able to negotiate modifications to the existing collective bargaining agreement. *See Matter of Sol–Sieff Produce Co.,* 82 B.R. at 793.

**(D) Did The Union Reject The Proposed Modifications With Good Cause?**

Section 1113(c)(2) of the Bankruptcy Code provides that an application to reject a collective bargaining agreement may be approved only if "the authorized representative of the employees has refused to accept such proposal without good cause".

■ Even though debtor has the ultimate burden of persuasion on this matter, the union is required to come forward with evidence of its reason for not accepting debtor's proposals if rejection of a collective bar-

gaining agreement is to be avoided. *Truck Drivers Local 807 v. Carey Transportation, Inc.*, 816 F.2d 82, 92 (2d Cir.1987). Where the union makes a counterproposal during negotiations that meets its needs while preserving the debtor's savings, its rejection of debtor's proposal is with good cause. *In re Royal Composing Room, Inc.*, 848 F.2d 345, 347 (2d Cir.1988), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989). Union intransigence during negotiations when debtor needs relief from the union may indicate lack of good faith on the union's part. *See In re Garofalo's Finer Foods*, 117 B.R. at 371.

■ As was previously indicated, the union presented a counterproposal on April 9, 1996, calling for initial wage concessions ranging between one and ten percent and for annual wage increases and recovery of all concessions in the final year of a three year contract. In support of the counterproposal, the union reluctantly provided debtor with a cost analysis prepared by its chief negotiator which ostensibly showed that debtor would realize sufficient savings under the counterproposal to avoid liquidation. Submission of the counterproposal and cost analysis, the union argues, establishes that it rejected debtor's proposed modifications with good cause.

This last proposition is without merit. The totality of the circumstances surrounding negotiations between debtor and the union leads us to conclude that the union rejected debtor's proposed modifications without good cause, notwithstanding its counterproposal and cost analysis. The cost analysis submitted by the union was grossly unrealistic and was a sham intended to disguise the union's intransigent unwillingness to bargain in good faith with debtor.

The methodology underlying the analysis was unlike generally accepted methods used for determining cost in the retail grocery industry. The projected savings to debtor supposedly resulting from the union's counterproposal were based only on hours worked by employees belonging to the bargaining unit and did not take into account the cost of employing other essential personnel such as non-unionized managers and officers of the debtor. Moreover, the analysis was based on productivity levels applicable to all types and sizes of retail grocery stores, from the mom-and-pop corner store to the largest supermarkets.

Because the cost analysis reluctantly provided by union included only the cost of employing members of the bargaining unit and did not take into consideration the cost of employing others, it grossly understated the costs debtor would incur for paid vacations, holidays, etc. Moreover, if debtor were to implement the analysis provided by the union, debtor would be able to employ only forty-eight employees, some sixty-five fewer than it now employs, and would be unable to staff the "store in a store" that it now operates. Liquidation undoubtedly would follow.

When challenged on cross-examination to justify the methodology employed and to explain its results, the union's chief negotiator launched into a hostile tirade that had all the earmarks of a filibuster.

Our conclusion that the union did not reject debtor's proposals with good cause is not derived solely from the patently unrealistic cost analysis upon which its counterproposal was based. Other conduct by the union also persuades us that it was not bargaining in good faith and had rejected debtor's proposed modifications without good cause.

As was previously indicated, debtor and the union also had discussed modifying the existing collective bargaining agreement in October of 1995, nearly six months prior to the sessions held in March, April, and May of 1996. During these earlier negotiations, the union preliminarily agreed to modifications that are virtually identical to those proposed by debtor in March of 1996. In particular, the union had preliminarily agreed to a reduction in wages and holiday premium pay; to elimination of Sunday premium pay, New Year's Day as a paid holiday, and of paid "personal days". Its preliminary acceptance was never finalized for reasons that are not clear. However, once debtor filed for bankruptcy and sought to modify the terms of the collective bargaining agreement on an interim basis, the union changed its tune and

adamantly refused to agree to the same modifications when debtor proposed them again.

Also, the union's chief negotiator stated at the final bargaining session held on May 3, 1996, that the union wanted debtor to fail so that the union could "cut a deal" with Penn Traffic after it took over the store.

These additional considerations, when combined with the wildly implausible cost analysis the union had submitted in support of its counterproposal, compel the conclusion that the union never intended to bargain in good faith and rejected the modifications debtor proposed without good cause.

### (E) Does The Balance Of The Equities Clearly Favor Rejection?

Section 1113(c)(3) of the Code provides that a collective bargaining agreement may be rejected only if "the balance of the equities clearly favor rejection of such agreement".

The balance of the equities favors rejection when debtor is in need of substantial relief from a collective bargaining agreement and the bargaining process has failed to produce any results and is unlikely to produce any in the foreseeable future. *In re Royal Composing Room,* 62 B.R. 403, 408, *aff'd,* 78 B.R. 671 (S.D.N.Y.1987), *aff'd,* 848 F.2d 345 (2d Cir. 1988), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989).

The balance of the equities in this instance clearly favors rejection of the collective bargaining agreement. As we indicated previously, debtor unquestionably will have to undergo liquidation in the very near future unless it is relieved of the high labor costs imposed by the collective bargaining agreement. The sacrifices that employees belonging to the bargaining unit would have to make under the proposed modifications are not disproportionate to the sacrifices that other employees, creditors, and debtor's current supplier and sublessor will have to make to avoid debtor's liquidation. Given the union's intransigence in refusing to budge and to grant debtor economic relief that it sorely needs to avoid liquidation, the only prospect debtor has of reorganizing requires that it be authorized to reject the present collective bargaining agreement with the union.