**In re NATIONAL FORGE COMPANY, et al., Debtors.**

**National Forge Company, et al., Movant,**

**v.**

**Independent Union of National Forge Employees, Respondent.**

**Bankruptcy No. 02–10488. Motion No. GCF–10.**

United States Bankruptcy Court, W.D. Pennsylvania.

March 17, 2003.

Guy C. Fustine, Erie, PA, for Debtors.

Ira H. Weinstock, Harrisburg, PA, for Respondent.

Joel M. Walker, Pittsburgh, PA, for J.P. Morgan Chase Bank.

David W. Lampl, Pittsburgh, PA, for Official Committee of Unsecured Creditors.

Lawrence C. Bolla, Erie, PA, for Official Committee of Retirees.

Douglas A. Campbell, Pittsburgh, PA, for Ellwood Group, Inc.

## OPINION [1]

WARREN W. BENTZ, Bankruptcy Judge.

### I. Introduction

On March 6, 2002 ("Petition Date"), National Forge Company, National Forge Company Holdings, Inc. and National Forge Components, Inc. (collectively "Debtor" or "Company") filed a voluntary Petition under Chapter 11 of the Bankruptcy Code. The cases have been consoli-

---

1. The within Opinion constitutes this Court's findings of fact and conclusions of law.

dated for joint administration under the National Forge Company case at Bankruptcy Number 02–10488. The Independent Union of National Forge Employees ("Union") and the Debtor are parties to a Collective Bargaining Agreement dated July 1, 2000 (the "CBA"). The CBA is scheduled to expire on July 1, 2003.

On May 6, 2002, Debtor filed a Motion to Reject Collective Bargaining Agreement in Accordance with 11 U.S.C. § 1113 at Motion No. GCF–2. Following an evidentiary hearing, Motion No. GCF–2 was denied by Opinion and Order dated June 19, 2002. *In re National Forge Co.*, 279 B.R. 493 (Bankr.W.D.Pa.2002).

On June 21, 2002, Debtor filed a Motion for Interim Relief Pursuant to 11 U.S.C. § 1113(e) at Motion No. GCF–3. Following an evidentiary hearing, Motion No. GCF–3 was granted by Order dated June 26, 2002.[2]

On December 23, 2002, Debtor filed a further Motion to Reject Collective Bargaining Agreement in Accordance with 11 U.S.C. § 1113 at Motion No. GCF–10. An evidentiary hearing was held on January 7, 2003 and on that same date, in accordance with the comments announced in open Court, an Order was entered which provides that "the Debtor's Collective Bargaining Agreement with the Independent Union of National Forge Employees is rejected in accordance with the provisions of 11 U.S.C. § 1113 as of the date of the date of this Order." We write to clarify and amplify the basis for our decision.

## II. Jurisdiction

We have jurisdiction over this Motion pursuant to 28 U.S.C. § 1334, 28 U.S.C.

§ 157(a), and the Order of Reference from the United States District Court for the Western District of Pennsylvania. This is a core proceeding under 28 U.S.C. § 157(b).

## III. Facts

Much of the factual background leading up to the Debtor's bankruptcy filing and subsequent negotiations with the Union is detailed in our June 19, 2002 Opinion reported at *In re National Forge Co.*, 279 B.R. 493 (Bankr.W.D.Pa.2002) and familiarity with that Opinion is presumed. In the June 19, 2002 Opinion, we recognized an immediate need for substantial modifications to the CBA and anticipated that, in the absence of an agreement with the Union, the Debtor could seek interim changes under § 1113(e).[3]

The Motion for Interim Relief under § 1113(e) followed. By Order dated June 22, 2002, Debtor was granted interim relief which included, *inter alia*, a 6% wage rollback, cancellation of 5% wage increase scheduled for June 2, 2002, increase in employee share of health care costs, elimination of company matching funds for savings plan, elimination of double time, changes in hourly retirement plan, and elimination of bonus plans. The Union estimates that the interim changes resulted in decreased earnings and benefits of $3,000 per employee between June 22, 2002 and January, 2003.

The interim relief did not provide Debtor liquidity needed to propose a plan of reorganization which would allow Debtor to continue in operation in its present form. As a condition to continued financing, Debtor's major secured lender fixed a

---

**2.** The Union appealed the June 26, 2002 Order. The matter is presently pending at No. 02–3959 before the United States Court of Appeals for the Third Circuit.

**3.** All Code sections refer to Title 11 of the United States Code, unless otherwise indicated.

deadline for the Debtor to obtain a signed contract for the sale of its business assets. Debtor actively began seeking offers from prospective buyers.

On November 18, 2002, Debtor and the Ellwood Group, Inc. ("Ellwood") executed an Asset Purchase Agreement ("APA") which provides for the sale of substantially all of Debtor's assets to Ellwood for a price of $25,000,000 (subject to certain adjustments) subject to Bankruptcy Court approval. The Ellwood proposal did not contemplate assumption of the CBA or any of Debtor's retiree obligations.

On the same day the APA was executed, Debtor sent a letter to the Union to explain that the APA contemplated a sale of all of the Debtor's assets, cessation of Debtor's business operations, and the termination of all employees in January, 2003. The Debtor proposed that it and the Union mutually agree to operate under the CBA as modified by the Bankruptcy Court until the last day of the Debtor's operation and terminate the CBA at that time. Debtor offered to provide any information the Union needed, and to meet with the Union to discuss the request.

The day after the APA was executed, Debtor's financial advisor met with representatives of the Union regarding the CBA and the effects of the sale. The financial advisor provided the Union with a week by week timeline of the sale process:

Week of November 11

* Seek Board approval to sign Asset Purchase Agreement

* Complete negotiations of Asset Purchase Agreement

Week of November 18

* Commence 1113 negotiations

* Commence 1114 negotiations

* Execute Asset Purchase Agreement

* File Sales Procedure Motion with Court

* Commence Additional Due Diligence Period for Other Bidders

Week of December 2

* Due Diligence Period for Ellwood Expires

Week of December 16

* Bankruptcy Court Hearing—Approval of Sales Procedures Motion

* File 1113 Motion (if required)

* File 1114 Motion

* File Motion to Dismiss National Forge Holdings Chapter 11

Week of January 6

* Bankruptcy Court Hearings:
    * Motion to Approve Sale
    * Motion to Approve Disclosure Statement
    * 1113 Motion (if required)
    * 1114 Motion
    * Motion to Dismiss Holdings Chapter 11

* Mail Disclosure Statements and Ballots

Weeks of January 6, 13 and 20

* CBA negotiation (if required)

Week of January 27

* Close Sale Transaction

* Terminate all Employees

Week of February 3

* Bankruptcy Court Hearing—Confirm Plan of Reorganization

The financial advisor explained the timeline so that everyone would know what the Debtor anticipated that the process would be. The timing was driven by the expedited sale process imposed by the secured

lenders which required a closing by January 31, 2003. There was a suggestion that the Union might ask for a $400 per person severance pay in exchange for termination of the CBA.

The Union's main concern, understandably, was knowledge of Ellwood's or any other buyers' plans for the facility. Unfortunately, that information was not within the Debtor's knowledge and Ellwood elected not to negotiate with the Union until after the sale was approved by the Court.

On November 25, 2002, Debtor filed a Motion to Approve Bidding Procedure and Breakup Fee at Motion No. GCF–6 and a Motion to Sell Real and Personal Property at Motion No. GCF–7 ("Sale Motion").

On November 26, 2002, representatives of the Debtor met with the Union to discuss the effects of the sale and termination of the CBA. The Union understood that the Debtor offered to provide $400 per Union employee for a mutual termination of the CBA.

On November 27, 2002, Debtor filed its Disclosure Statement and Proposed Chapter 11 Plan of Reorganization.

Debtor and the Union had a further meeting on December 5. The Union expressed its displeasure with the $400 offer and indicated that mutual termination of the CBA would only be considered if the Union successfully reached an agreement with the buyer of the Debtor's assets. The Union requested copies of the Disclosure Statement and Plan (which had previously been provided to the Union's counsel) and information on entities that had expressed an interest in the purchase of Debtor's assets. Debtor provided the requested information later the same day. The APA and the Disclosure Statement and Plan are the necessary documents to evaluate Debtor's proposal to the Union.

On or about December 10, 2002, after the Court had indicated that it would approve the bidding procedures proposed by the Debtor, Debtor provided Ellwood with notice of the existence of the CBA as required by the CBA. A similar notice was provided to Park Corporation, the only other qualified bidder under the established bidding procedure.

In a letter to the Union dated December 11, 2002, Debtor advised the Union of Ellwood's decision to waive the requirement in the APA that a collective bargaining agreement be ratified before the sale. Debtor further indicated that it considered the proposal for a one-time severance payment of $400 per employee to be fair and equitable. Debtor solicited further input from the Union and offered to schedule a meeting if the Union provided any basis warranting further discussion.

In its response on December 11, 2002, the Union again expressed dissatisfaction with the Debtor's offer and compared the $400 offer to the employment contracts of the executive officers approved early in the case by the Bankruptcy Court under which the Chairman, President and CEO and the Chief Financial Officer are to receive a year's salary as severance pay. The Union reiterated its requirement that a new agreement with the buyer be in place before it could agree to termination of the CBA.

On December 18, 2002, Debtor filed a Motion to Assume/Reject Executory Contracts at Motion No. GCF–8 and a Motion to Assume/Reject and Assign Pipeline Agreements at Motion No. GCF–9. On December 23, 2002, Debtor filed a Motion to Reject Collective Bargaining Agreement in Accordance with 11 U.S.C. § 1113 at Motion No. GCF–10 ("§ 1113 Motion") and a Motion for Modification of Retiree Benefits Pursuant to § 1114(g) at Motion No. KL–41 ("§ 1114 Motion").

A hearing was fixed for January 7, 2003 to consider the § 1114 Motion, § 1113 Motion, Sale Motion, the Motions to Assume/Reject Executory Contracts and Pipeline Agreement, and Approval of Debtor's Disclosure Statement.

By the time of the hearing on January 7, 2003, the parties interested in the § 1114 Motion had arrived at a settlement. Like the Union members, the retirees (and in some cases where the retiree has died, the surviving spouse) made interim concessions under which they paid a portion of health care costs. Also, like the Union members, the retirees lost any money they had invested in the Company's Employee Stock Ownership Plan ("ESOP"). Once the Debtor's assets are sold, Debtor will not be able to continue health care coverage for retirees. The retirees have little or no opportunity to seek other employment to provide wages and health insurance. Under the terms of the settlement, the retirees, as a group, receive an unsecured claim in the amount of $5,250,000 for which they will receive a dividend with the class of general unsecured creditors. In addition, Debtor will terminate its Voluntary Employee Benefit Association ("VEBA") plan and the retirees will receive any balance remaining from the overfunding of the VEBA plan. The retirees will set up a trust and use the funds to provide assistance with a portion of health care coverage costs.

Debtor and Union were unable to reach a resolution and evidence on the § 1113 Motion was heard on January 7.

The CBA contains a strong successor clause. It provides:

This Agreement, and any Supplements, shall be binding on the parties hereto and upon each of their successors and assigns, and upon any party who shall purchase or otherwise acquire all or substantially all of the assets of the Irvine, Pennsylvania, facility of the Company and continue to operate the business at that location in a substantially unchanged manner. Except as otherwise expressly provided herein, the provisions of this Agreement shall be effective on the date of execution hereof. The Company agrees that there shall be no intent to circumvent the Labor Agreement or any bargaining unit rights through any sale, lease, transfer or merger involving the Irvine facility.

The obligations of this Agreement shall be included in any and all agreements of sale, transfer, or assignment of all or substantially all of the assets of the Irvine facility. The terms and conditions of this Agreement shall continue to be binding for the life of this agreement on the Irvine, Pennsylvania facility in the event it is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings.

The Company shall give notice of the existence of this Agreement to any purchaser or transferee involved in the sale, merger, consolidation, or other transaction by which all or substantially all of the assets of the Irvine facility may be transferred. Such notice shall be in writing, with a copy to the Union, at the time the seller makes the sale negotiation known to the public or executes a contract for sale, whichever first occurs.

Because of the successor language, Debtor and its advisors were compelled to seek rejection of the CBA prior to confirmation of the sale to eliminate a potential claim by the Union under the successor clause. Leaving open the possibility of such a claim would be detrimental and unfair to non-Union employees, retirees and unsecured creditors.

Union members have made great sacrifices for the Debtor. In addition to con-

cessions imposed by the interim modifications, Union members gave up a portion of their wages for five years in exchange for stock in the ESOP which is now worthless. It is estimated that each employee lost $20,000 in the ESOP. Now, as a result of the sale and rejection of the CBA, all of the jobs will end. Health insurance and other benefits will be lost. Claims for vacation pay, if any, and claims which arise from unresolved grievances will necessarily be asserted in the bankruptcy proceeding. Those who lose their employment as a result of the sale will likely be entitled to unemployment benefits while they seek new employment. Some may be employed by the successful buyer.

A sale might be possible without rejection of the CBA but such a sale would chill the bidding due to uncertainties with the Union. Counsel for Park Corporation, the only qualified bidder other than Ellwood, stated that failure to reject the CBA prior to the bidding process would have "a chilling effect on what we are willing to bid." Following rejection of the CBA, the sale hearing took place. There was spirited bidding between Park Corporation and Ellwood with a price increase from the original offer of $25 million to a final bid of $30.7 million.

## IV. Discussion

### A. Law

Section 1113 sets forth the requirements for rejection of a collective bargaining agreement. It provides in relevant part:

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees cov-

ered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

■ Certain prerequisites must be met before the Court can authorize rejection of a collective bargaining agreement under § 1113:

1. DIP must make a proposal to the Union to modify the CBA. 11 U.S.C. § 1113(b)(1)(A).

2. Proposal must be based on the most complete and reliable information available. 11 U.S.C. § 1113(b)(1)(A).

3. Proposed modifications must be *necessary* to permit the reorganization of the DIP. 11 U.S.C. § 1113(b)(1)(A).

4. Proposed modifications must assure that the DIP and all affected parties are treated fairly and equitably. 11 U.S.C. § 1113(b)(1)(A).

5. DIP must provide the Union such relevant information as is necessary to evaluate the proposal. 11 U.S.C. § 1113(b)(1)(B).

6. Between the time of the making of the proposal and the time of the hearing, the DIP must meet at reasonable times with the Union. 11 U.S.C. § 1113(b)(2).

7. At the meeting, the DIP must confer in good faith in attempting to reach mutually satisfactory modifications of the CBA. 11 U.S.C. § 1113(b)(2).

8. Union must have refused to accept the proposal without good cause. 11 U.S.C. § 1113(c)(2).

9. The balance of the equities must clearly favor rejection. 11 U.S.C. § 1113(c)(3).

*See In re American Provision Co.,* 44 B.R. 907, 909 (Bankr.D.Minn.1984); *In re Bowen Enterprises, Inc.,* 196 B.R. 734 (Bankr.W.D.Pa.1996).

■ As to each of the nine prerequisites for rejection of the CBA, Debtor bears the burden of proof. *In re Bowen Enterprises, Inc.,* 196 B.R. 734, 741 (Bankr.W.D.Pa. 1996).

### B. Prerequisites for Rejection of CBA

#### 1. Proposal to Union

■ Immediately after execution of the APA, Debtor and its financial advisors met with the Union to outline the sale process and the steps to be taken leading to cessation of Debtor's business operation at the end of January, 2003. Debtor made a proposal that the Debtor and the Union mutually agree to operate under the terms of the CBA, as modified by the Court, through the date of closing with the purchaser with a voluntary termination of the CBA as of that date. The Debtor subsequently offered a severance payment of $400 per employee for the Union's agreement. Discussions were conducted until immediately prior to commencement of the hearing on January 7 at which the Debtor increased its offer to $1,000 per employee.

We find that the Debtor made a proposal to the Union to modify the CBA.

#### 2. Complete and Reliable Information

The Debtor provided the Union with the APA, Debtor's Sale Motion and its liquidating Plan and Disclosure Statement. Debtor's financial advisor met with the Union the day after the APA was signed and provided the Union up-to-date information, a realistic time line, and reasonable prediction regarding the outcome of the case. The Union was provided with information on all entities that had expressed interest in acquisition of the Debtor's assets.

We find that the Debtor's proposal was based on the most complete and reliable information available.

#### 3. Modification Necessary

Debtor lacks the liquidity necessary to complete a stand-alone reorganization. The only way for the Debtor to accomplish a reorganization is through the sale of assets. The Debtor's lender set forth strict deadlines for negotiation and consummation of a sale in order to allow the Debtor continued use of cash collateral. No buyer was willing to assume the CBA. Potential ongoing disputes over the CBA

threatened to chill the bidding in the absence of rejection.

The proposed modification in the form of rejection of the CBA is necessary to permit reorganization of the Debtor.

### 4. Fair and Equitable

■ The sale of all of the Debtor's assets and the end of the Company as it is now known is a sad day for the Union, the retirees, creditors and other parties. The sale price makes it impossible for the Debtor to fulfill all of its promises and obligations to all parties. The question is whether all parties are treated fairly and equitably.

A debtor may not seek to place a disproportionate share of the financial burden of avoiding liquidation upon bargaining unit employees. The burden must be spread fairly and equitably among all affected parties. *Wheeling–Pittsburgh Steel [v. United Steelworkers of America]*, 791 F.2d [1074] at 1091 [(3d Cir. 1986)]. The focus of inquiry is upon whether the proposed sacrifices will be borne exclusively by members of the bargaining unit or will be spread among all affected parties. *Id.* The concessions sought from various parties must be examined from a realistic standpoint. *Id.* at 1093.

*In re Bowen Enterprises, Inc.,* 196 B.R. 734, 743 (Bankr.W.D.Pa.1996).

The Debtor has endeavored to make certain that all parties are treated fairly and equitably.

All employees and retirees have made interim concessions during the course of the bankruptcy. All present jobs will end upon closing of the sale. Benefits will cease. Present employees will be entitled to unemployment benefits and have some chance at obtaining employment with the successful buyer or to seek other employment. Retirees, or their surviving spouses, who, at least for the most part are unable to seek other employment with replacement benefits, will receive a distribution on an agreed claim to enable some subsidization of health care benefits for a period of time.

The Union complains of the amount of the severance payment to the Company's two top executives. The contracts of those two executives were approved by the Court early in the case to ensure that the executives would remain with the Debtor during the bankruptcy to guide it through the process.

The Union will have an opportunity to assert any claim that it may have arising from its members' services to the Debtor for which it will receive distribution on allowed claims in accordance with the priorities provided by the Bankruptcy Code.

Unsecured creditors will share the pain. They will receive a dividend on their claims. Some may have an opportunity to do business with the buyer, some may not.

Rejection of the CBA is necessary to assure that no significant additional liabilities arise under the CBA. Absent rejection prior to the sale, the estate is arguably exposed to a claim for damages to the Union for wages and benefits through the end of the term of the CBA even though the Company is gone and no jobs are available.

The most significant reason for rejection is the chilling effect that the CBA would have on the sale price if left in place. The rejection led to spirited bidding which resulted in the estate's receipt of an additional $5.7 million which inures to the benefit of all affected parties.

The proposed rejection of the CBA assures that the Debtor and all affected parties are treated fairly and equitably.

### 5. Relevant Information

The Debtor provided the Union with the APA, Sale Motion, the proposed Liquidation Plan and Disclosure Statement, and information on all parties who had expressed an interest in the purchase of Debtor's assets. Debtor responded to all information requests by the Union. Debtor's financial advisor detailed the liquidation process to the Union.

Debtor provided the Union all relevant information as is necessary to evaluate the proposed rejection of the CBA.

### 6. Meet at Reasonable Times

Immediately after the APA was executed, on November 19, 2002, the Debtor's financial advisor met with the Union and detailed the anticipated process. Representatives of the Debtor met again with the Union on November 26 and December 5. On December 11, 2002, Debtor solicited further input from the Union and offered to schedule a meeting if the Union provided any basis warranting further discussion.

The Union and the Debtor met prior to the start of the hearing on January 7, 2003.

The Debtor met at reasonable times with the Union between the time of making the proposal and the time of the hearing.

### 7. Confer in Good Faith

Debtor initially suggested voluntary termination of the CBA as of the date of the sale closing on or before January 31, 2003. Subsequently, Debtor offered a $400 severance payment.

The Union refused, demanding the assumption of the CBA by a buyer, or that a new collective bargaining agreement be negotiated with a buyer prior to termination of the CBA. Unfortunately, Ellwood refused to negotiate prior to the sale. The

Union's demand was not within the scope of Debtor's control. Debtor did provide the Union with information on anyone who expressed any interest in the purchase.

The Debtor and the Union met prior to the hearing on January 7, 2003. Representatives of Ellwood and Park Corporation were present in the Courtroom. They apparently continued to refuse to negotiate with the Union prior to the sale. Debtor increased its offer to $1,000 per employee which the Union found unacceptable.

The Debtor has conferred in good faith in attempting to reach a mutually satisfactory agreement for termination of the CBA.

### 8. Refusal to Accept Proposal Without Good Cause

Throughout the process, between the first meeting on November 19, 2002 and the start of the hearing on January 7, 2003, the Union steadfastly demanded that any buyer assume the CBA or negotiate a new contract before it would consider termination of the CBA. Such demands were beyond Debtor's control and impossible for the Debtor to satisfy. The Union had ample opportunity to contact all parties who expressed any interest in purchasing Debtor's assets. The Union's insistence that the Debtor provide something which was not within its control indicates that the Union's refusal to accept Debtor's proposal was without good cause.

### 9. Balance of Equities

█ "The balance of the equities favors rejection when debtor is in need of substantial relief from a collective bargaining agreement and the bargaining process has failed to produce any results and is unlikely to produce any in the foreseeable future." *Bowen,* 196 B.R. at 747, *citing In re Royal Composing Room,* 62 B.R. 403,

408 (Bankr.S.D.N.Y.1986), *aff'd,* 78 B.R. 671 (S.D.N.Y.1987) *aff'd* 848 F.2d 345 (2d Cir.1988) *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989).

The balance of the equities in the instant matter demands rejection of the CBA. The Debtor is under the mandate of its major secured lender to complete an expedited sale process, in default of which the Debtor faces liquidation. The sacrifices that the Union will make upon rejection of the CBA are not disproportionate to the sacrifices the non-Union employees, retirees, and creditors will make. A sale at the highest possible price is clearly best for all concerned. Achievement of the highest possible price requires that the CBA be rejected.

## V. Conclusion

The Debtor has satisfied its burden of proof for rejection of the CBA under § 1113 and the nine part test for rejection set forth in *In re American Provision Co.,* 44 B.R. 907 (Bankr.D.Minn.1984) and the cases following it.

An appropriate Order granting the Debtor's § 1113 Motion was entered on January 7, 2003.