In re NATIONAL FORGE COMPANY, et al., Debtor.

National Forge Company et al., Movant,

v.

Independent Union of National Forge Employees, Respondent.

Bankruptcy No. 02–10488.
Motion No. GCF–2.

United States Bankruptcy Court, W.D. Pennsylvania.

June 19, 2002.

Guy C. Fustine, Esq., Richard Zamboldi, Esq., Erie, PA, David A. Murdoch, Esq., Pittsburgh, PA, for Debtor.

Michael Kaminski, Esq., Pittsburgh, PA, for J.P. Morgan Chase Bank.

Ira H. Weinstock, Esq., Harrisburg, PA, for Independent Union of National Forge Employees.

Arthur Martinucci, Esq. and Lawrence C. Bolla, Esq., Erie, PA, for Official Committee of Retirees.

David W. Lampl, Esq. and John M. Steiner, Esq., Pittsburgh, PA, for Official Committee of Unsecured Creditors.

## OPINION

WARREN W. BENTZ, Bankruptcy Judge.

### Introduction

On March 6, 2002 ("Petition Date"), National Forge Company, National Forge Company Holdings, Inc. and National Forge Components, Inc. (collectively, "Debtor" or "Company") filed a voluntary Petition under Chapter 11 of the Bankruptcy Code. The cases have been consolidated for joint administration under the National Forge Company case at Bankruptcy Number 02–10488. The Debtor and the Independent Union of National Forge Employees ("Union") are parties to a Collective Bargaining Agreement dated July 1, 2000 (the "CBA"). Presently before the Court is the Debtor's MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENT IN ACCORDANCE WITH 11 U.S.C. § 1113 ("Motion"). The Official Committee of Unsecured Creditors ("Creditors' Committee") supports the process in which the Debtor seeks to reject the CBA. The Union opposes the Motion. An evidentiary hearing was held June 4–5, 2002; briefs were subsequently filed; and the matter is ripe for decision.

### Jurisdiction

We have jurisdiction over this Motion pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and the Order of Reference from the United States District Court for the Western District of Pennsylvania. This is a core proceeding under 11 U.S.C. § 157(b).

### Facts

Debtors' management recognized an imminent liquidity crisis and engaged Cornerstone Capital Advisers ("Cornerstone") as restructuring and reorganization consultants on November 20, 2001. Charles F. O'Hanlon III ("O'Hanlon") is the managing director of Cornerstone. O'Hanlon provided expert testimony at trial, most of which was unrefuted.

Upon Cornerstone's engagement, O'Hanlon and his partner, Ron Cooper, examined Debtor's financial documentation and operations. Debtors' executives and all senior management were interviewed regarding the Debtor's relations with its customers, competitors, community and employees. Cornerstone made recommendations which it presented to Debtor's lenders and Directors on December 19 and 20, 2001. The recommendations are based on four premises, none of which were refuted by the Union:

a) There are limited growth prospects for the company's principal products,

b) The company operates in a mature market that is very competitive, giving the company few opportunities for improved margins through price increases,

c) Demand for all of the company's products is somewhat cyclical, and

d) Although the company's liquidity problem was immediate, the stakeholders desired a solution that would permit the company to sustain itself for the next five years.

Cornerstone made several conclusions regarding the Debtor's operation, among which was a determination as to annual employment and retiree healthcare costs:

To achieve the required cash earnings to meet its obligations and sustain itself, the company needed to reduce its annual employment and retiree healthcare costs by approximately $6 million versus its December 2001 run rates.

Cornerstone recommended certain actions to include:

a) Reducing salaried headcount from 136 to 85, and imposing salary and benefit reductions on the salaried workforce,

b) Renegotiate the company's Collective Bargaining Agreement ("CBA") with the Independent Union of National Forge Employees ("IUNFE") by seeking wage reductions, eliminating scheduled wage increases, aligning the incentive system with company's financial objectives, eliminating of certain fringe benefits, and the restructuring of healthcare and pension benefits into defined contribution plans, and

c) Soliciting those retired employees with defined benefit healthcare plans and requests that they accept a defined contribution plan that was consistent with the plans of other retirees and active employees.

Cornerstone proposed a plan (the "Plan") which provides for a reduction in annual salaried employment costs of $2.1 million, in hourly employment costs of $2.9 million and in retiree healthcare costs of $750,000. A reduction in employment costs is the only significant savings that Debtor can achieve in a short time period. If employment cost savings are not achieved, Debtor will be unable to survive.

Debtor anticipated that it would be in violation of the covenants of the loan agreement with its secured lenders by the end of December 2001. The Cornerstone Plan was presented to the lenders. The lenders agreed to a waiver of the pending financial defaults through April 30, 2002 to give the Debtor an opportunity to achieve the cost savings set forth in the Plan.

The Plan was presented first to the Debtor's Board of Directors and then to management and all employees on January 23, 2002. The presentation to all employees provided details as to how Cornerstone envisioned that the Plan would affect salaried, hourly, and retired employees, and how it believed the changes would enable the Debtor to sustain operations.

On January 25, 2002, Debtor requested a meeting with the Union to discuss "economic cost saving changes which could result in modifications to the current collective bargaining agreement." An initial meeting was held on January 31, 2002. Prior to Petition Date, several meetings were held, proposals and counterproposals made, but the parties were unable to reach resolution. POSTPETITION meetings began on March 25, 2002. On that date, Debtor presented the Union with a comprehensive proposal covering 23 different items in two groups: Wage Concessions and Additional Items. The proposal was based on advice Debtor had received from Cornerstone and all available financial information. The Union and the Debtor had some 20 days of meetings between March 25 and May 29, 2002. Changes were discussed and ideas were exchanged. The Union was presented with Debtor's Last and Final Proposal on May 29, 2002. The Last and Final Proposal differs significantly from the March 25 proposal. Many of the changes requested were dropped. The Last and Final Proposal provides for the following changes to the CBA:

1. *New Incentive Program*—Form an Ad Hoc committee to develop a new incentive plan with an interim report due by 1/1/2003, and the final plan completed by 7/1/2003. If the parties cannot agree on the final plan by the 7/1/2003 deadline, the matter will be submitted to binding arbitration. The parties will make a joint request to The Honorable Warren Bentz that he appoint an independent arbitrator who is familiar with incentive compensation plans.

2. *6% Wage Rollback*—Effective July 1, 2002, all Hourly Grade Base Rates

will be rolled back 6% to rates listed on page 38 of the Collective Bargaining Agreement and which were first in effect on July 2, 2001.

3. *Cancel 5% Wage Increase scheduled for 7/2/2002*—The 5% wage increase originally scheduled to become effective July 1, 2002, and as depicted on page 39, is deferred until the following schedule commences on July 1, 2003. At that time 1/5 of the 5% increase will be implemented each month for 5 consecutive months. If an across-the-board increase is given to salary employees (snap-back) during fiscal year 2003 (July 1, 2002 through June 30, 2003), Union members would get the same across-the-board percent increase.

4. *Healthcare*—Effective July 1, 2002, all employees will pay $22.50 per week for healthcare coverage (medical, prescription, dental and vision) under the Highmark Core Plan. Prescriptions— agree to go from 15% to 25% co-pay, with $15.00 generic mail order and $25.00 non-generic mail order. After July 1, 2003, employees to share 50/50 of any premium increase up to a maximum of $40.00 per month per employee.

5. *Savings Plan*—Effective July 1, 2002, the Company will indefinitely eliminate the 1–3% elective Company savings match for employee contributions. Article XVI, Other Agreements, 4) Savings Plan of the CBA will be so modified.

6, *Vacation Rate*—Effective June 1, 2002, Article X(E), page 22 of the CBA, is eliminated. All future vacation rate calculation and payment will be at the hourly Grade Base Rate in effect for each employee at the time the vacation is used, or if unused and paid out, at the time the unused vacation is paid out.

7. *Double Time*—Effective July 1, 2002, Article VIII, Overtime, (C) Double Time, page 18, of the CBA is eliminated. All overtime will be paid at time and one-half.

8. *National Forge Company Retirement Plan for Hourly Employees*—

a) Effective July 1, 2002, all earned pension benefits will be frozen at the then existing levels. No further service credit will be earned after that date. All future retirement benefits for hourly represented employees will be funded solely by having the Company make monthly non-elective 3% defined contribution to each Employee's individual 401(k) account. The 3% defined contribution will be based on the base wage earnings for each individual. The Employee will own the account and can determine how to invest such funds, make loans against such funds, and take the balance of the account when he or she quits or retires.

b) Effective July 1, 2002, future retirees must meet one of the two following criteria in order to participate in any company-sponsored healthcare program that is offered to retirees:

I) Achieve age 62 and have at least 15 years of completed service, or

ii) Any age of retirement with 35 years of completed service.

c) Company funding for retiree healthcare for individuals who retire during the term of this CBA will be consistent with that offered all retirees.

9. *Appendix C, Excess Profit Bonus Plan and Memorandum (39) Quarterly Cash Flow Bonus Plan*—The Union and Company agree to form an Ad hoc Committee to discuss a bonus plan to replace current plans. Current plans will remain in effect until new plans are agreed upon. New, revised plans to be agreed upon by July 1, 2002. If the parties cannot agree on the final plan by the 7/1/2002 deadline, the matter will be

submitted to binding arbitration. The parties will make a joint request to The Honorable Warren Bentz that he appoint an independent arbitrator who is familiar with bonus plan designs and programs.

10. *Article (B) Pay Practices—Eliminate item 5) Pay Practices, and 9) Wilder Field,* pages 5 and 6 of the CBA. Effective July 1, 2002, the payroll will go to bi-weekly payroll for all hourly represented employees. At the appropriate time, the Company will pursue the sale of Wilder Field.

11. *Past Practice—Healthcare for Laid Off Employees*—The past practice of providing six months of company-funded Healthcare after an employee is laid off will be changed to three months effective June 1, 2002.

12. *Contract Extension, Article XVIII,* Duration & Termination—The Union and the Company agree to extend the CBA as amended in this Agreement for 1 year. The new expiration date will be noon, June 30, 2004.

When it appeared that negotiations had reached a stalemate, Debtor filed the Motion on May 6, 2002. Meetings with the Union and negotiations continued after the Motion was filed. The last meetings were held May 29, 2002. No agreement was reached.

Meanwhile, wage cuts and other curtailments were imposed on salaried employees. Cornerstone recommended that the number of salaried employees be reduced from 125 to 85. The number has been reduced to 98. The Debtor calculates its savings from salary workforce concessions as follows:

| | |
|---|---|
| Job eliminations | $1,437,000 |
| Wages reduced by 6% | 450,000 |
| Eliminate Savings Plan Match | 179,000 |
| Reduce Casual Employees/Consultants | 110,000 |
| Eliminate Double Time and Bonus Programs | 39,000 |
| Total Projected Savings | $2,215,000 |

There are 410 employees covered by the CBA. About 350 of these are presently working with the balance on lay-off, sickness and accident, or worker's compensation. An Employee Stock Ownership Plan ("ESOP") was created in 1995. The employees received stock. They currently own 72% of the outstanding shares. The stock was received in exchange for no wage increases between 1995 and 2000. The stock is now presumed worthless.

Certain job positions of Union employees have been consolidated. Nineteen positions have been eliminated. Some 40 employees have been laid off. No savings from these consolidations or layoffs have been included in the Debtor's calculation of Union Workforce Concessions. The Union has made concession proposals which it has calculated will save the company $1,682,000 and $1,800,000 with no credit for job consolidations or layoffs. The Union estimates an additional savings of $1,100,000 from job consolidations and layoffs.

## The Rejection Process

A debtor in possession (DIP) may reject a collective bargaining agreement by following the requirements mandated in 11 U.S.C. § 1113. The parties agree as to the prerequisites that must be met before the Court can authorize rejection of a collective bargaining agreement under § 1113:

1. DIP must make a proposal to the Union to modify the CBA. 11 U.S.C. § 1113(b)(1)(A).

2. Proposal must be based on the most complete and reliable information available. 11 U.S.C. § 1113(b)(1)(A).

3. Proposed modifications must be *necessary* to permit the reorganization of the DIP. 11 U.S.C. § 1113(b)(1)(A).

4. Proposed modifications must assure that the DIP and all affected parties are treated fairly and equitably. 11 U.S.C. § 1113(b)(1)(A).

5. DIP must provide the Union such relevant information as is necessary to evaluate the proposal. 11 U.S.C. § 1113(b)(1)(B).

6. Between the time of the making of the proposal and the time of the hearing, the DIP must meet at reasonable times with the Union. 11 U.S.C. § 1113(b)(2).

7. At the meeting, the DIP must confer in good faith in attempting to reach mutually satisfactory modifications of the CBA. 11 U.S.C. § 1113(b)(2).

8. Union must have refused to accept the proposal without good cause. 11 U.S.C. § 1113(c)(2).

9. The balance of the equities must clearly favor rejection. 11 U.S.C. § 1113(c)(3).

*See e.g. In re American Provision Co.*, 44 B.R. 907, 909 (Bankr.D.Minn.1984); *In re Bowen Enterprises, Inc.*, 196 B.R. 734 (Bankr.W.D.Pa.1996).

### Positions of the Parties

Of the nine prerequisites, the Union agrees that Debtor has complied with numbers 1, 5, 6 and 7. Debtor believes that it has met the requirements of each prerequisite.

The Union asserts that Debtor did not base its proposal on the most complete and reliable information that was available because O'Hanlon did not interview any Union employees before Cornerstone issued its report and because the report is based on information solely supplied by the Debtor which is currently six months old.

The Union asserts that the Last and Final Proposal contains changes that are not necessary to permit reorganization. It asserts that the incentive program, absent agreement, be submitted to binding arbitration which would leave a substantial item open for future decision and is not necessary to permit reorganization. The Union asserts that the same is true to the development of an Excess Profit Bonus Plan.

The Union asserts that changing the payroll from weekly to bi-weekly is not necessary for reorganization nor is the Debtor's plan to pursue a sale of Wilder Field at an appropriate time.

The Union asserts that it should not be compelled to accept a contract which contains an unknown healthcare program for its future retirees and to be bound in that regard by a decision to be made at a later date over which the Union has no control.

The Union also asserts that the plan proposed by the Debtor fails to treat all affected parties fairly. The Union asserts that the salaried employees were given preferential treatment. The Union states in its post-trial brief:

> The Union employees took a wage freeze from July 1, 1995 to July 1, 2000. The Debtor issued stock to the employees as a result of the ESOP plan. The stock had a value, based on Mr. Bogardus' testimony, of approximately $50,000.00 per person and is currently worthless. Mr. Bogardus also testified that the bargaining unit held 72% of the stock. It is submitted that the loss of $50,000.00 in stock, a wage freeze of five years and a requested $7,000.00 decrease is more than a person can handle and still survive. The Debtor also requested that the Union employees take a decrease of $2.9 million per year and subsequently reduced that number to approximately $2.1 million per year. The Debtor gave the salaried employees credit for layoffs and attrition of approximately $1.5 million. The Debtor did not give credit to the Union for the

combination of nineteen jobs which was a savings of $1.1 million or the layoff of fifty employees which would be another $1.5 million dollars. The Union offered concessions of at least $1.5 million in addition to the $2.6 million aforementioned.

The Union asserts that it has good cause for refusal of the Debtor's Last and Final offer. It asserts that the Union's counterproposal met its needs while providing Debtor's required savings.

Finally, the Union asserts that a balancing of the equities favors the Union in that if rejection is permitted, there will likely be a strike which would cause the failure of the Debtor.

### Discussion

As to each of the nine prerequisites for rejection of the CBA, Debtor bears the burden of proof. *In re Bowen Enterprises, Inc.,* 196 B.R. 734, 741 (Bankr.W.D.Pa.1996). The parties agree that requirement 1, 5, 6 and 7 are satisfied. Debtor made a comprehensive proposal to the Union on March 25, 2002 which, through discussions and negotiations, was continuously revised and resulted in the Debtor's Last and Final Proposal on May 29, 2002. Following the proposal on March 25, and continuing through May 29, the parties held numerous bargaining sessions at which the proposed modifications were discussed at length. Debtor promptly provided the Union with all information that it requested.

The dispute involves the remaining requirements, number 2, 3, 4, 8 and 9. We address them in order.

A. *Proposal Based on Most Complete and Reliable Information* (Item 2)

The Union asserts that the Debtor did not base its proposal on the most complete and reliable information as O'Hanlon never interviewed any Union employees before Cornerstone issued its report and the report "is based on information solely supplied by the Debtor and is currently six months old."

We disagree. Prior to issuance of its report, Cornerstone representatives performed a detailed review of the Debtor's financial information and its operation. Debtor's annual audited as well as interim financial statements were reviewed. In addition, tax returns, management information generated monthly and weekly, loan documentation and security documents were examined. Meetings were held with executive and senior management. Cornerstone performed a complete review of Debtor's information and operations before generating its report. The report was based not solely on information provided by the Debtor, but upon Cornerstone's independent evaluation of the companies' financial data which included the most current information available, at that time, the interim financial reports through October.

During the period of negotiation, March–May, 2002, the proposal changed based on those negotiations and upon consistent reviews by both the Debtor and the Union of updated information. The Union had its financial adviser, Harry Kokkinis, inspect the Debtor's books and records. Kokkinis voiced no concerns or disagreement with Cornerstone's assessment of the Debtor's financial situation.

We conclude that all of the Debtor's proposals, including the Last and Final Proposal dated May 29, 2002, were based on the most complete and reliable information available.

B. *Proposed Modification Must be Necessary to Permit Reorganization of the Debtor–in–Possession* (Item 3)

11 U.S.C. § 1113(b)(1)(A) provides in part that a debtor's proposal shall

provide for those modifications "that are necessary to permit the reorganization of the debtor..." 11 U.S.C. § 1113(b)(1)(A).

Only those modifications which are directly related to debtor's financial condition and are essential to its reorganization are "necessary" for purposes of s1113(b)(1). *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America*, 791 F.2d 1074, 1081 (3d Cir.1986). The focus when making this determination is upon the short-term goal of avoiding liquidation, not upon the long-term goal of making debtor "whole" once it emerges from reorganization. *Id.* at 1089. In short, a proposed modification is "necessary" in this context only if it is the minimum that is essential to prevent debtor's liquidation. Any proposed modifications that go beyond this are not "necessary" for purposes of § 1113(b)(1)(A).

*In re Bowen Enterprises, Inc.*, 196 B.R. at 741–42.

■ Debtor is out of formula with its secured lenders. The lenders have afforded the Debtor a short period of time to achieve the employee cost reductions as set forth in Cornerstone's report. Cornerstone opined that the Debtor must achieve an annual $5.7 million reduction in employee costs. The necessity for $5.7 million in reductions is not contradicted. Without such savings, the Debtor is facing a prompt liquidation.

The comprehensive proposal presented by the Debtor to the Union on March 25, 2002 set forth a laundry list of items, many of which we would have viewed as not being non-monetary and not "necessary" to its reorganization. Through discussions and negotiations, the Last and Final proposal of May 29, 2002 eliminates most of the items which could be viewed as unnecessary. Each item in the Last and Final proposal is designed to provide an economic benefit to the Debtor to enable it to proceed toward reorganization in the short term. Certainly some of the listed concessions are of greater importance and of greater monetary value than others. The change in pay periods from weekly to biweekly and the sale of Wilder Field may be a minor item standing alone. Nevertheless, as part of an overall cost reduction effort we cannot say that they are unnecessary. Also, the 2 year proposal might have been properly limited to a one year contract, so that employees could more quickly benefit from business improvement. However, the existing CBA is a two year contract, which indicates that a two year contract is part of past practice, and the proposal contains certain snap-back provisions which begin to ameliorate the wage reduction. At this critical junction a two year contract may be deemed necessary to show, and in fact accomplish, a stable work force and business continuity.

C. *Proposed Modifications Must Assure that the Debtor–in–Possession and All Affected Parties are Treated Fairly and Equitably* (Item 4)

■ 11 U.S.C. § 1113(b)(1)(A) also provides in part that proposed modifications must assure that "all creditors, the debtor and all of the affected parties are treated fairly and equitably." 11 U.S.C. § 1113(b)(1)(A).

A debtor may not seek to place a disproportionate share of the financial burden of avoiding liquidation upon bargaining unit employees. The burden must be spread fairly and equitably among all affected parties. *Wheeling–Pittsburgh Steel*, 791 F.2d at 1091. The focus of inquiry is upon whether the proposed sacrifices will be borne exclusively by members of the bargaining unit or will be spread among all affected parties. *Id.* The concessions sought from various

parties must be examined from a realistic standpoint. *Id.* at 1093.

*In re Bowen Enterprises, Inc.*, 196 B.R. at 743.

The Union asserts that salaried employees were given preferential treatment as opposed to Union employees. The Debtor sought and has imposed cost reductions on salaried employees which result in a savings of over $2 million. Salaried employees will suffer a 6% wage reduction, no pay increases for fiscal year 2003, a heavier workload and the necessity to work increased hours per employee on account of a reduction in the number of salaried personnel, elimination of the savings plan match and elimination of doubletime and bonus programs. Salaried employees have previously contributed to healthcare costs and had their pension plans frozen and changed to a 401(k) plan. It is proposed that salaried employees be paid bi-weekly instead of weekly. In the Last and Final Offer, Union employees have also been asked to incur $2 million in annual concessions. Those concessions include a 6% wage reduction, a delay in the implementation of a 5% increase scheduled for later this year, changes in the present incentive program, making a contribution to healthcare costs, elimination of savings plan match, elimination of double time, changes in the calculation of vacation pay, freezing the present pension plan and instituting a 401(k) plan, changes in the requirement for eligibility to participate in healthcare programs offered to retirees, changes in the bonus plan, conversion to bi-weekly payroll, reduction in the length of time for continued healthcare for laid-off employees, and a one year extension in the expiration of the CBA.

The Union asserts that its members accepted a wage freeze for five years in return for stock issued as a result of the ESOP plan and that the stock is now worthless. We do not know if salaried employees also hold stock. In any event, shareholders take a risk on the growth and profitability of a company in exchange for the potential rewards. We cannot find that the losses on the value of the Debtor's stock held by Union employees makes the proposal unfair or inequitable. In fact, a financially healthy company will benefit the employee stockholders.

The Union asserts that in the calculation of concessions, the salaried employees counted the savings of $1,437,000 from job eliminations to reach a total reduction of $2,215,000 while the Union received no credit for lay-offs or job consolidations in the calculation of its concessions. The elimination of salaried positions puts a greater workload on remaining employees and forces them to work harder and longer hours. The lay-offs and job consolidations for the Union Group are functions of production and rise and fall with sales volume.

It may be that the Company's proposal for salaried job eliminations is given more weight than the hourly job consolidations. However, the number of salaried employees contributing to the $2.2 million cost reduction is only a third of the hourly workers contributing the same amount.

The whole exercise in balancing the cost reductions may be futile because it assumes that the reduced work force, both salaried and hourly, are presumed to be capable of producing as much as the larger work force. The salaried workforce of 125, now 98, suffers a $2.2 million cost cut, and the hourly workforce of 350 suffer a cut of a like amount. Also, the allocation of the projected cost savings of about $2 million for each group is initially arbitrary, but conceived as a way of balancing the impact of the cost reductions. The balancing of the impact on different segments of the work force cannot be an exact science. We regard the Company's effort to strike

a balance as a good faith effort and meets the tests of fairness and equity.

■ "Fairness and equity do not require that the proposed treatment of employees belonging to the bargaining unit be identical to the anticipated treatment of other affected parties." *Bowen Enterprises* at 743.

As between the salaried and Union employees, we do not perceive that the Debtor is seeking to have members of the Union bear a disproportionate share of the sacrifices to enable the Debtor to avoid liquidation.

Debtor's assets will likely not support anything beyond payment of secured creditors should the Debtor be sold or liquidated. If the Debtor is successful and obtains confirmation of a plan of reorganization, unsecured creditors are certain to suffer significant reductions and receive only a percentage distribution on their claims.

Debtor's proposal has a defect, however. Debtor intends to seek concessions from retirees. The Cornerstone Plan required a savings of $750,000 on retiree health care costs. Debtor now states that $2 million in concessions will be required from the retirees. 11 U.S.C. § 1113 requires a finding that the proposed modifications assure that all parties are treated fairly and equitably. Without knowing the ultimate amount of the concession to be made by the retirees, it is impossible to make a determination that the proposed modifications are fair and equitable. Instead of $2 million in concessions by the retirees, the retirees may give up or be forced to give up under 11 U.S.C. § 1114 substantially more or substantially less, in which case the $2 million sought from the Union might not be fair and equitable.

### D. Union Must Have Refused to Accept the Proposal Without Good Cause (Item 8)

The requirement that the Union must have refused to accept the proposal without good cause corresponds with the previous requirements. The proposal injects into the CBA the health care program which the Company expects to obtain from existing retirees, which is an unknown quantity at the present time. The Company's proposal would commit the Union, without Union participation, to whatever health care plan the Company negotiates with existing retirees, or to whatever plan might be achieved through the use of 11 U.S.C. § 1114. Since it is impossible to determine whether the Debtor's proposal is fair and equitable as to the concessions sought from retirees, the Union had good cause to reject the proposal.

### E. The Balance of Equities Must Clearly Favor Rejection (Item 9)

It is clear that substantial modifications to the CBA are necessary in the short term if this Debtor is to be able to reorganize and avoid a liquidation. The Concessions sought from the Union must be fair and equitable in relation to the Concessions given by all parties in the case. The Concessions must be the minimum "necessary" to enable the Debtor to move forward. The point of equilibrium has not been reached. While substantial modifications in the CBA must be made almost immediately if the Debtor is to survive, the balance of the equities clearly favors rejection, with the exception noted above.

### Conclusion

For the reasons set forth above, the motion must be refused. The Court certainly anticipates that the parties will continue to attempt to resolve the issues so that the ultimate goal shared by all par-

ties, survival of the Debtor, can be achieved. It is anticipated that if a prompt accord is not reached, the Debtor will again seek approval of similar modifications under another motion brought under § 1113 and may also seek to implement interim changes under § 1113(e). An appropriate order will be entered.